1      **UNITED STATES DISTRICT COURT**
       **FOR THE DISTRICT OF NEW JERSEY**
2

3  ─────────────────────────────

   BRAINTREE LABORATORIES, INC.    CIVIL ACTION NUMBER:
4  and SEBELA US INC.,

                                   23-cv-2853-CPO
5       Plaintiffs,

                                   SCIENCE DAY PRESENTATION
6       v.

7  LUPIN LIMITED and LUPIN
   PHARMACEUTICALS, INC.,
8
        Defendants.
9  ─────────────────────────────

10      Mitchell H. Cohen Building & U.S. Courthouse
        4th & Cooper Streets
11      Camden, New Jersey  08101
        October 15, 2024
12      Commencing at 12:06 p.m.

13  B E F O R E:            THE HONORABLE CHRISTINE P. O'HEARN,
                            UNITED STATES DISTRICT JUDGE
14

    A P P E A R A N C E S:
15

16      ROBINSON MILLER LLC
        BY:  KEITH J. MILLER, ESQUIRE
17      Ironside Newark
        110 Edison Place, Suite 302
18      Newark, NJ 07102
        For the Plaintiffs
19

20      WILMER CUTLER PICKERING HALE AND DORR LLP
        BY:  LISA J. PIROZZOLO, ESQUIRE
21      60 State Street
        Boston, MA 02109
22      For the Plaintiffs

23          Sharon Ricci, Official Court Reporter
                sharon.ricci.usdcnj@gmail.com
24                    267-249-8780

25   Proceedings recorded by mechanical stenography; transcript
            produced by computer-aided transcription.

**APPEARANCES CONTINUED:**


WILMER CUTLER PICKERING HALE AND DORR LLP
BY:  CHRISTOPHER R. NOYES, ESQUIRE
     LAUREN E. MATLOCK-COLANGELO, ESQUIRE
     GABRIEL ROSANIO, ESQUIRE
7 World Trade Center
New York, NY 10007
For the Plaintiffs


MIDLIGE RICHTER, LLC
BY:  JAMES S. RICHTER, ESQUIRE
645 Martinsville Road
Basking Ridge, NJ 07920
For the Defendants


KNOBBE MARTENS LLP
BY:  WILLIAM R. ZIMMERMAN, ESQUIRE
1901 K Street, N.W.
Washington, DC 20036
For the Defendants


KNOBBE MARTENS LLP
BY:  BRIAN C. BARNES, ESQUIRE
2040 Main Street, Fourteenth Floor
Irvine, CA 92614
For the Defendants



**ALSO PRESENT:**   Haley Minix, Courtroom Deputy

*United States District Court*
*District of New Jersey*

```
 1              (Proceedings held in open court before The Honorable
 2    Christine P. O'Hearn, United States District Judge, at 12:06
 3    p.m.)
 4              THE COURTROOM DEPUTY:  All rise.
 5              THE COURT:  Okay.  Please be seated.  We're on the
 6    record in the matter of Braintree Laboratories vs. Lupin
 7    Limited, 23-cv-2853.
 8              May I have appearances of counsel, starting with
 9    plaintiffs.
10              MR. MILLER:  Good afternoon, Your Honor.  Keith Miller
11    from the law firm of Robinson Miller, Newark, New Jersey, for
12    the plaintiffs.
13              Also with me are my co-counsel from Wilmer Hale,
14    Christopher Noyce.
15              MR. NOYCE:  Good morning, Your Honor.
16              MR. MILLER:  Lisa Pirozzolo.
17              MS. PIROZZOLO:  Good morning, Your Honor.
18              MR. MILLER:  Gabe Rosanio.
19              MR. ROSANIO:  Good morning, Your Honor.
20              MR. MILLER:  And Lauren Matlock-Colangelo.
21              MS. MATLOCK-COLANGELO:  Good morning.
22              THE COURT:  Good morning.  And for defendants?
23              MR. RICHTER:  Good afternoon, Your Honor.  James
24    Richter from Midlige Richter on behalf of Lupin.
25              And with me today are my co-counsel from the Knobbe
```

1    Martens firm, William Zimmerman and Brian Barnes.

2         THE COURT:  Thank you everyone for coming early.  I

3    will tell you that I have a criminal matter that I have to

4    cover for the Chief at 1:30, so hopefully that may come between

5    the break of your presentations.  And if not, we'll break at an

6    appropriate time.

7         And I'll just ask you to step back.  It's a

8    non-detained defendant, he'll come forward, I'll take the plea.

9    You're welcome to leave the courtroom.  It will take me

10   30 minutes, and then we'll finish.  I apologize.  But it's a

11   criminal matter and it has to be done today.

12        But thank you for coming in.  Just give me one second.

13        (Brief pause.)

14        THE COURT:  Okay.  I have all your briefs.  Is

15   plaintiff ready to proceed?

16        MR. NOYES:  We are, Your Honor.

17        THE COURT:  All right.  Thank you.

18        MR. NOYES:  And, Your Honor, I have some printed

19   copies of slides, if that would be helpful.

20        THE COURT:  Okay.  Great.

21        MR. NOYES:  And may I approach, Your Honor?

22        THE COURT:  Yes.

23        MR. NOYES:  May I proceed, Your Honor?

24        THE COURT:  Yes.

25        MR. NOYES:  And let me just say one thing.  With

1    respect to the slides that I just handed out, they do have --
2    we were overzealous.  They were marked as attorney-client
3    privilege.  These obviously are not attorney-client privilege.
4    We're happy to replace the slides if Your Honor would like
5    replacements.
6         THE COURT:  I'm going to write all over my copy and
7    I'm the only one that's going to see it, so it's okay.
8         MR. NOYES:  Thank you.  And I conferred with
9    Mr. Zimmerman from Lupin as well.
10        So, Your Honor, we're here for science day to present
11   a technology tutorial about the technology related to these
12   patents.  And again, my name is Chris Noyes, and together with
13   my colleagues we'll be presenting today.  I'm going to start,
14   Your Honor, talking about some of the background of the
15   technology, and then Ms. Pirozzolo is going to finish the
16   presentation talking about specifics related to the technology
17   and the asserted patents.
18        THE COURT:  Okay.
19        MR. NOYES:  Now, Your Honor, this is a Hatch-Waxman
20   case and it's about Braintree's bowel prep called SUTAB and the
21   Orange Book patents that cover the product.  And SUTAB is an
22   osmotic laxative.  It's a specific type of laxative.  It's FDA
23   approved for cleansing of the colon in preparation of
24   colonoscopy.
25        And bowel preps, like SUTAB shown here, are necessary

1  for an effective colonoscopy, and that's important because

2  colonoscopy is essential for the detection and prevention of

3  colon cancer.

4        And just briefly, Your Honor, I'm going to walk

5  through colon cancer at a high level screening and detection

6  and osmotic bowel preps, and then Ms. Pirozzolo will talk about

7  technology of the asserted patents.

8        Now, Your Honor, in the United States, colon cancer is

9  the second most common cause of cancer death to this day.  Over

10  50,000 deaths caused by colon cancer in 2023.  And it's one of

11  the leading causes of cancer death for people under 50 years

12  old.  It's the leading cause for men under 50 and the second

13  leading cause for women under 50 years old.

14        The American Cancer Society estimated in 2023 that

15  over 150,000 people would be diagnosed with colon cancer, and

16  it estimated that it would kill over 50,000 people, including

17  thousands of people actually younger than 50 years old.

18        And Your Honor, as colon cancer prevalence has

19  increased, the recommendations for when people are screened

20  with colonoscopy has decreased, so now the recommendation is

21  that anyone age 45 and older get screened for colonoscopy.  It

22  used to be 50 and older.

23        The American Cancer Society has also identified

24  increasing access to high-quality screening as the number one

25  way to achieve progress against colon cancer.

1        Now, just a very brief background of gastrointestinal

2    anatomy before we get into the technical details.  And this is

3    how the GI tract works.  You see the stomach, of course digests

4    food; it turns it into this liquid slurry; and then that liquid

5    slurry moves from the stomach into the small intestine, which

6    is in the middle there, sort of the flat smaller tube.  In the

7    small intestine, the body absorbs vitamins, minerals, and other

8    nutrients.  And as the nutrients are absorbed, whatever is left

9    over, the waste product, moves into the colon, which is the

10   larger bumpy organ shown here.

11       The colon is about six feet long.  And that's the

12   organ in this case, the colon, that we're primarily concerned

13   with.  Once the liquid slurry gets into the colon, the body

14   absorbs whatever water is left to make hard stool, and then the

15   stool obviously gets -- moves into the rectum for expulsion.

16       Now, colon cancer screening.  Colon cancer starts with

17   a polyp generally on the inner lining of the colon.  And they

18   start off as a result of what's called hyperproliferation of

19   cells, and they look like these small, mushroom-shaped polyps

20   on the inner lining of the colon.  And it's not just polyps,

21   actually.  Sometimes it could be very flat, almost lesion-like

22   growths that can result in colon cancer.

23       So removing these polyps at an early stage when

24   they're benign can prevent the development of cancer.  And the

25   five-year survival rate is about 75 to 90 percent if these

1  polyps are identified in their benign stage.  But if a polyp is

2  not removed and continues to grow, you can see here, it becomes

3  malignant and turns into colon cancer, and that develops --

4  that causes fatalities.

5       As these polyps continue to develop, they become

6  malignant, and the survival rate drops to 40 percent.  And then

7  when you get to the Stage 4, the latest stage, only five

8  percent survival rate.  So again, early detection, finding the

9  polyps is the most important thing to preventing colon cancer.

10      And screening is the major way to reduce colon cancer

11 deaths.  But it's really underused.  It's actually still

12 underused today.  Researchers from the University of

13 Pennsylvania and Memorial Sloan-Kettering determined that

14 63 percent of colon cancer related deaths in 2010 were caused

15 by non-screenings, people just didn't get screened, and that's

16 why they were dying.  And that means that screening could have

17 saved the lives of over 32,000 people in 2010 alone.

18      Now, increasing screening has been the goal for

19 researchers in this space because increasing screening for

20 people 45 and older, especially those with risk factors, has

21 tremendous potential health benefits.

22      Now, colonoscopy, Your Honor.  This is just a picture

23 of the colon and how colonoscopy works.  It's the gold standard

24 still to this day for detection.  You may have seen ads for

25 Cologuard and things like that on TV, which is a DNA test.  But

1  at the end of the day, even if you do take one of these DNA

2  tests, you have to get a colonoscopy if you come up -- if it's

3  a suggestion that you have colon cancer.

4       And this is a -- the colonoscope is inserted into the

5  colon and it has a camera at the end, and it has this little

6  snare at the end as well so it allows the doctor to identify

7  polyps or other cancerous lesions and then to remove them with

8  this snare.

9       And colonoscopies at bottom require a clean colon to

10  work.  If the colon is not sufficiently clean, waste and other

11  debris can obscure the doctor's ability to see, find, and

12  detect polyps.

13       And you could compare this to driving down a road, for

14  example, with fog.  You might not see potholes, you can't see

15  the view, you can't see the road signs and that could be

16  dangerous.  And colonoscopy is -- not being able to see could

17  be extremely dangerous because the doctor can't find polyps.

18  They could be in that long six-foot organ, they could be hiding

19  in the various cracks and crevices.  And if they're not

20  identified, a couple years go by after your screening, and they

21  can obviously turn into malignant cancers.

22       The other thing about insufficient cleansing is that

23  the patients will come for their colonoscopy, they're both in

24  this prep process, which we'll talk about, which is, as you'll

25  see, a very unpleasant process.  And one of the big major

1    barriers of colonoscopy, they have to be rescheduled.  And a

2    lot of times people are out of work, they don't come back for

3    screening.  They don't get the second screening if they're

4    rescheduled, and so they go years without being screened for

5    colon cancer.  And that obviously can cause polyps to develop

6    into malignant cancers.

7            Now, in many cases it's stool in the colon that isn't

8    flushed out from the prep that causes inadequate visualization,

9    but some of these bowel preps also can be too cloudy, they can

10   be too shiny, and that also can impede visualization.

11           So it's not just how well the bowel prep works, it's

12   all how it's made, what are the components that are important

13   for adequately -- for adequate prep and clear colons.

14           Now, unfortunately, even with all the advancements and

15   colon preps which we'll talk about, as of 2020, doctors were

16   still seeing about 15 to 35 percent of inadequately prepared

17   colons during colonoscopy procedures.  So the bottom line is,

18   you need an adequate prep for a colonoscopy; you need to be

19   able to see in the colon and to identify and remove polyps.

20   And without that, we're not going to be making much progress

21   against colon cancer.

22           But historically, Your Honor, the prep has been a

23   major barrier to colonoscopy --

24           THE COURT:  I want to know who are the 45 percent of

25   the people who think it's not the worst part.

```
 1            (Laughter.)

 2            THE COURT:  Because I was able to evade during COVID

 3     for several years until last year, so I'm very curious as to

 4     who the other 45 percent are.

 5            MR. NOYES:  Right.  I ask that question myself.

 6            THE COURT:  Some of you are not 50 yet, I can see, but

 7     some of us are, so I'll just leave it at that.

 8            MR. NOYES:  Yes.  It is interesting, who are the

 9     45 percent who say that's not the worst part?

10            But yes, a vast majority of the people believe, and

11     the studies have shown this, that it is the worst part of

12     colonoscopy and it's the biggest deterrent to getting a

13     colonoscopy.  People just don't want to take the prep, and for

14     two reasons, which we'll talk about.

15            Many of them are in this big, large volume.  These are

16     the original preps from the early '80s.  They're still

17     available today.  They're called 4-liter preps.  People just

18     can't drink that much liquid or it's made up of sort of a salty

19     liquid, there's electrolytes in them, they just can't consume

20     that.  And of course, the effects of this obviously are

21     unpleasant for people as well.

22            So we have this double whammy where you can't drink

23     the prep, take the prep, and you don't like to experience the

24     prep, causes you to do, and so people just are not complying

25     with the prep and that results in an inadequate preparation for
```

1    colonoscopy.

2            Now, over the years, Your Honor, there have been many

3    FDA-approved products for bowel preps, and here's a timeline

4    through 2020.  And there's actually some FDA-approved ones

5    after 2020.  But Braintree has been an innovator in bowel prep

6    since the early 1980s, and Braintree was a small company that

7    was founded in Braintree, Massachusetts, thus the name,

8    Braintree Labs.  And in 1984, they received FDA approval for

9    GoLYTELY, which was essentially this 4-liter volume prep.

10           And we have a key here on the slide for Your Honor.

11   These original 4-liter preps were made up of something called

12   polyethylene glycol or PEG, and that polyethylene glycol was

13   used to flush the colon, and we'll get into how that worked in

14   a moment.

15           But those are the 4-liter preps that forced patients

16   to drink all of this liquid to have an adequate prep.  And you

17   can see over the years Braintree has continued to develop new

18   preps.  There was the NuLYTELY prep in the early 1990s, that

19   was also a 4-liter PEG-based solution that had some flavoring.

20   They added a lemon packet to make it more palatable, but still

21   not palatable enough.

22           And then in the early 2000s, they came up with

23   HalfLytely, which was actually a 2-liter, so half of this, half

24   a gallon, and continued to innovate.  We'll talk about these

25   different preps.

1       Starting in 2010, Braintree introduced SUPREP to the

2   market, which is a small volume, 16 ounces, a different type of

3   prep.  You see here it has sulfate salts.  And then in 2020 is

4   when the FDA approved SUTAB, which is the product at issue in

5   our case, which is sulfate salt based prep but in a tablet

6   form.

7       And below the Braintree products are products that

8   were developed and introduced by other companies, which we'll

9   talk about, PHOSPHO-SODA, VISICOL, and OsmoPrep.  And as you

10  can see, those were all phosphate salt products.  And that

11  phosphate salt allowed these products to be very small volume

12  prep, so not the large volume, but they ended up being

13  effective, but extremely dangerous, and I'll talk about that in

14  a moment.

15      And then finally, there's a product on the market now

16  that's competing with SUTAB, an FDA product called CLENPIQ.

17  And that, as you see here, is a picosulfate liquid.  Now,

18  picosulfate, that's not really relevant for purposes of today,

19  but that's a different chemical.  That's called a stimulant

20  laxative, and it actually is not related to the sulfate salts

21  that are in SUTAB.  It's just a different chemical composition.

22      Now, one of the things that's very important in preps

23  and bowel preps is the concept of electrolytes in the body, and

24  this is just a very simple example.  Electrolytes are

25  essentially salts dissolved in water.  So the table salt

1  example, solium, chloride, and ACL.  You put in water and it

2  breaks up into two different ions, one sodium and one chloride.

3  And we have all these electrolytes in our body.  Our body is --

4  60 percent of our body is made up of water and we have these

5  dissolved electrolytes in our body.

6       And those are all important, very important to

7  different body functions.  And we have a slide on that.  We are

8  going to talk about that in a moment.

9       But they are essential to different important body

10  functions and there's a range that they need to be in for a

11  healthy person to be operating -- to be healthy.  And things

12  like exercise, diet, medications like bowel preps can alter the

13  balance of electrolytes in the body.

14       Now, another concept that you'll hear about, Your

15  Honor, that relates to how these bowel preps work is this

16  concept of tonicity, and that is a measure of osmotic pressure

17  in a solution.  And then osmotic pressure basically is you have

18  two different solutions with different salt concentrations.

19       So for example here, you have sea water, high salt

20  concentration; and then you have distilled water, lower salt

21  concentration.  The sea water is called hypertonic and then the

22  distilled water is called hypotonic.  And what happens here is

23  you have a membrane like a filter or a cell wall, for example,

24  semipermeable membrane.  So certain things can pass the

25  membrane but not everything.  There's something called osmotic

1    pressure, which is trying to achieve equilibrium between these

2    two concentrations.  So essentially you want the same amount of

3    salt in both, the salt water and the distilled water.

4          And so the sea water here will pull water from the

5    distilled water into the sea water in this example, causing the

6    sea water to be more dilute, less concentrated.  And that's

7    just the scientific phenomenon.  And that's that concept of

8    osmotic pressure that has been used in bowel preps like SUTAB

9    in our case, and previous preps, and we'll talk about more of

10   those in a moment.

11         But how they do this is they use these poorly

12   absorbable salts called osmotic agents, like sulfate salts or

13   phosphate salts.  And when those get in the colon -- and here's

14   an example.  When they're in the colon, what they do is they

15   pull water from the body into the colon.  And so that's what's

16   actually flushing the colon.  The water is pulled from the body

17   into the colon, that water softens the stool and causes the

18   purgation, the diarrhea that's necessary for colon cleansing.

19         On the left-hand side you'll see what these

20   larger-volume products called isotonic solutions.  So they

21   don't use the water in the body.  That's why you have to drink

22   so much of it.  Right?  You just are flushing the colon with

23   the liquid in the prep.

24         So you'll hear about hypertonic solutions, you'll hear

25   about isotonic solutions, and you'll hear about osmotic agents

1    and osmotic pressure in this case because that's the mechanism

2    of action that's making these products work.

3            And just very briefly, Your Honor, there's an impact

4    on cells on the body when you're using hypertonic solution.

5    The water has to come from somewhere. So what it does is it

6    actually takes the water out of the body and the cells can be

7    dehydrated. So not only are you getting dehydrated cells,

8    you're pulling electrolytes out of the body and those also get

9    flushed out.

10           And so when researchers are trying to develop these

11   colon preps, they're trying to make them work really well,

12   they're trying to get patients to comply to take them, but

13   they're also trying to avoid electrolyte imbalance and fluid

14   shifts, dehydration. So those are all the considerations that

15   the researchers are working with when they're trying to make

16   bowel preps.

17           So now, the bowel preps, we talked a little bit about

18   this already. We have the GoLYTELY and the NuLYTELY, which are

19   these 4-liter preps; these are the isotonic ones, you're just

20   flushing the colon; and then there was the further development

21   of the 2-liter prep. These worked essentially this way, Your

22   Honor, and this is a very simplified diagram. But you have

23   colon, stool in the colon before ingestion, and then you have

24   your body water. You drink all of this liquid prep, and then

25   -- the prep not only has the PEG in it, which can't be

1  absorbed, but it also has some electrolytes in it.  And what

2  happens is it flushes the colon and the multiple instances of

3  diarrhea, so by the end the goal is to have a clear liquid and

4  all the stool is out of the body.

5       The body water, though, remains the same because you

6  haven't pulled any water from the body, or very little water

7  from the body into the colon and the electrolytes' balance stay

8  the same because these products had electrolytes, that's why

9  they're salty, to replace what was being flushed out.

10      Now, these are very safe products.  They're still

11  available.  People still use them.  Doctors still prescribe

12  them.  But again, the patient compliance is a huge issue with

13  these.  And a lot of times people will drink half the dose,

14  three-quarters of the dose, have one, you know, instance of

15  diarrhea and say I'm done, I'm just not doing it.  And then

16  they go to the doctor, and the doctor either says -- you know,

17  they might miss a polyp or they reschedule them for another

18  colonoscopy.

19      So because of this, there are other researchers trying

20  to solve the problem.  They said, how do we come up with a

21  small-volume prep?  And here's two examples that became very

22  poplar after the large-volume preps were on the market.

23      One was called Fleet PHOSPHO-SODA and the others were

24  called VISICOL and OsmoPrep.  These both were smaller-volume

25  preps.  You can see the Fleet was essentially 45 milliliters

1  total that you took, so a lot smaller.  These preps all used

2  phosphate salts.  And they were very effective and patient

3  compliance was very good because the volume was so low.

4         The problem with these preps -- and let me just

5  briefly describe how these worked.  And again, talked about

6  this already, but these preps work by the osmotic agent

7  phosphate, creating that osmotic pressure, pulling water into

8  the colon and then it will soften the stool and things will get

9  flushed out.  Body water will get flushed out and electrolytes

10  will get flushed out as well.

11         And here's an example of how these would work.  You

12  see here you have electrolytes in your body, in your intestine,

13  in your colon, and you have your body water.  You ingest Fleet,

14  for example, that would result in effective cleansing, but what

15  would happen is you lose body water, you lose almost a gallon

16  of water from your body when you took Fleet.

17         And another problem with this particular formulation

18  was it didn't have electrolytes in it to replace the

19  electrolytes that were being lost from the body.  And in fact,

20  with PHOSPHO-SODA, the majority of potassium in the body was

21  lost when patients were taking this.  And as I mentioned

22  before, that's a really important thing because electrolyte

23  imbalances can cause medical conditions.

24         And just pausing on potassium here, for example, it's

25  essential for blood pressure, heart function, muscle function.

1    And if you lose it, it's called hypokalemia, loss of potassium.

2    You could have kidney damage, muscle weakness, dizziness, loss

3    of consciousness, et cetera, arrhythmias.  And there's some

4    other examples here, Your Honor, about how electrolytes are

5    required for important body function and how loss or too much

6    of those things can impact the health of people.

7            Now, the thing about Fleet was not only was it causing

8    loss of water, loss of electrolytes, it was actually killing

9    people.  And it was recalled -- the FDA issued a warning in

10   2008.  You can see here the product was actually recalled

11   because of serious side effects including destruction of the

12   kidneys.  Essentially it would deposit calcium and phosphate in

13   the kidneys and it was called nephrocalcinosis, it calcified

14   people's kidneys.  And so Fleet was taken off the market.

15           And then there was a black box warning in the label

16   for VISICOL and OsmoPrep, you can see it here.  These cases

17   resulted in permanent impairment of renal function and some

18   patients required long-term dialysis.  So it turned out these

19   products were very unsafe at the end of the day and they were

20   taken off the market.  They have all been discontinued at this

21   point.

22           Now, in -- so that was 2008 when the FDA said we have

23   a problem with these small-volume preps.  And in 2010, the FDA

24   approved another -- a different type of small-volume prep and

25   this was -- you can see the difference here, Your Honor.  This

1  was SUPREP and here's what the bottle was.  So you take two of

2  these, 16 ounces of these plus additional water.  And this

3  didn't have phosphates.  This had sodium sulfate, potassium

4  sulfate and magnesium sulfate, and those were the osmotic

5  agents like sodium phosphate but they didn't result in the

6  electrolyte problems, in the kidney damage problems of the

7  Fleet.

8          So -- and just briefly, Your Honor, this is how SUPREP

9  worked and still works today.  You see here the -- again,

10 there's electrolytes and there's stool in the colon and you

11 have your body water.  The prep itself has a balance of sulfate

12 salts that replace electrolytes that were lost.  It's a smaller

13 volume.  It does bring body water into the -- it does use the

14 body's water to flush the colon, but as part of the dosing

15 regimen you're drinking additional water to avoid dehydration.

16 And then the prep itself is balancing the electrolytes.

17         So that was a very safe prep, a smaller-volume prep.

18 Still, though, there were compliance issues because you can

19 imagine highly concentrated sulfate salts are not palatable for

20 many people.  They try to mask these with -- I forget which

21 flavor this was.  This was lemon lime or orange or something

22 like that.  But many people found them to be unpalatable and

23 you're still having compliance issues, even with SUPREP, which

24 was one of the most successful preps around.

25         So we're still left with a situation where you need an

1  effective prep that gives you sufficient cleansing for adequate

2  visualization of the colon, one that's safe, no electrolyte

3  disturbances that are dangerous, no dangerous fluid shifts, no

4  kidney damage but doesn't require patients to ingest all of

5  this liquid, all of this amount of -- or unpleasant tasting

6  liquids.

7         And that's where we end up for this case, Your Honor,

8  the SUTAB, which are -- if you look here, it's a split-dose

9  regimen.  So you take 12 pills the night before the colonoscopy

10 and then you take 12 pills the morning of.  And the only thing

11 you're required to drink is water.  And so this has potassium

12 chloride, sodium sulfate, and magnesium sulfate in it.  Again,

13 that induces the purgation by using an osmotic agent, brings

14 the body water into the colon, but it's an imbalanced solution

15 that replaces electrolytes and when you're drinking the water,

16 you're not getting dehydration.

17        So that's the background and probably a very too quick

18 history of colon preps, but now I'm going to turn it to

19 Ms. Pirozzolo and she's going to talk more about the patents

20 and how this technology relates to the patents.

21        THE COURT:  Thank you.

22        MS. PIROZZOLO:  Thank you, Your Honor.  Lisa Pirozzolo

23 for the plaintiffs.

24        I would like to briefly discuss the asserted patents

25 in this case.  They all claim priority to a 2017 patent

1    application and they're all directed to solid oral sulfate salt

2    formulations for cleansing the colon.

3            As the abstract of the patents explains, the patents

4    disclose these solid oral dosage formulations that comprise

5    sodium sulfate, magnesium sulfate, and potassium chloride for

6    colon cleansing.  Two of the patents, the '656 and the '697

7    Patents claim formulations for colon cleansing; and the other

8    two patents, the '498 and the '864 Patents claim methods of

9    colon cleansing.

10           Before we go through the claims, I was going to walk

11   through some of the important parts of the specifications.  And

12   the specifications you'll see have the background at Columns 1

13   and 2, a summary of the invention at Columns 2 to 5, a detailed

14   description of the invention and then examples.  So I'm going

15   to touch on aspects of the specification.

16           So in the detailed description, as discussed at Column

17   7, the claimed formulations are tablets that contain three --

18   these three salts:  Sodium sulfate, magnesium sulfate, and

19   potassium chloride.

20           The combination of these salts was developed to induce

21   hypertonic colon cleansing, as Mr. Noyes described a few

22   minutes ago.  The formulation was also designed to work without

23   causing the clinically significant electrolyte shifts that

24   Mr. Noyes discussed and the other adverse effects that some of

25   the phosphate-based formulations had experienced.

1          And so these concepts:  The combination of salts, the

2    avoiding electrolyte shifts, clinically significant electrolyte

3    shifts, and other side effects as discussed in the

4    specification.

5          So if -- as to the specific combination of salts, I've

6    put up a section of Column 2 of the patent, and this section of

7    the patent describes the specific combination of salts.  And

8    you can see the sodium sulfate in the blue box, magnesium

9    sulfate in the purple box, and potassium chloride in the green

10   box.  And the specification describes the specific amounts of

11   these salts that have to be in the formulation for it to have

12   the right effects.

13         So it's about 30 to about 40 grams of sodium sulfate,

14   about 4 to 8 grams of magnesium sulfate, and about 3 to 5 grams

15   of potassium chloride.  And then the spec described narrows

16   that down to more specific formulations with more specific

17   quantities of the three salts.

18         This specific combination of salts, as explained in

19   Column 5 of the patent, had two particular benefits.  First,

20   the inventors discovered that only two sulfate salts, the

21   sodium and magnesium sulfate, were required for colon

22   cleansing.

23         Second, the inventors discovered that including

24   potassium chloride along with the magnesium and sulfate salts

25   could avoid this problem of clinically significant electrolyte

1    shifts.  So when you combined the magnesium sulfate, the sodium

2    sulfate, and the potassium chloride in the amounts specified in

3    the specification, that would induce diarrhea, the purgation

4    you want for your colonoscopy, but it would reduce the

5    clinically significant gains or losses of electrolytes that

6    could be harmful to patients.

7          And so this specific combination was important.  And I

8    think Mr. Noyes has already covered this, but in terms of colon

9    cleansing, the specification explains at Column 5 how this

10   works, that the sulfate salts are poorly absorbed and so they

11   remain in the colon and they create this osmotic pressure that,

12   if you call the sea water and the fresh water, it causes the

13   water to enter the colon and induce purgation.  So that's how

14   the formulation effectively cleanses the colon.

15         But in addition to effectively cleansing the colon,

16   this combination addresses the two shortcomings in the prior

17   art that Mr. Noyes discussed.  So the medical dangers caused by

18   the clinically significant electrolyte shifts and also the

19   renal failure that had been caused by the phosphate-based

20   formulations.

21         So in terms of the clinically significant electrolyte

22   shifts, you know, we've talked about it, but by including this

23   specific balance, you keep kind of the electrolytes in the body

24   properly aligned.

25         And secondly, the inventors discovered you didn't need

1    to include phosphates such as been included in those other

2    colon preps that Mr. Noyes discussed, the one with the black

3    box labels.  You could have effective colon cleansing without

4    using phosphates.

5           So that is kind of how these formulations work and why

6    the combination of active ingredients is so important.

7           I wanted to shift to another important aspect of the

8    invention, which is the fact that these are in tablet form.

9    And the specification explains at Column 5 that the tablet

10   formulations include both active ingredients and inactive

11   ingredients.  The sodium sulfate, magnesium sulfate, and

12   potassium chloride we've been discussing are the active

13   ingredients in the formulation, and they're called active

14   ingredients because those are the ingredients that induce the

15   purgation of the colon and create the osmotic effect and

16   balance the electrolytes.

17          But the tablet formulations also include inactive

18   ingredients known as excipients that are necessary to actually

19   put these active ingredients into tablets that could be used.

20   And so it's these excipients that enable the tablet

21   formulation.

22          So in the Examples section of the patent you'll -- the

23   inventors describe specific formulations that they made.  So

24   for example, Table 1 of the specification shows three specific

25   formulations that the inventors made.  And you can see in

1  Table 1, in these examples, specific amounts of active

2  ingredients and inactive ingredients.

3          The three active ingredients that we've discussed are

4  discussed at the top in blue, purple and green, but then there

5  are two inactive ingredients or excipients that were in these

6  formulations that are in red and orange below.  And I'll talk

7  about those a little bit.

8          So excipients can do different things in a tablet.  We

9  have a picture of a tablet here.  Tablets have an inside, a

10  coating.  And these excipients do different things to make the

11  tablet work.

12          For example, the patent talks about the use of

13  lubricants in making tablets.  Lubricants are excipients that

14  facilitate the tableting process and make it easier for the

15  tablet to be ejected from the tablet machinery.  And as the

16  asserted patents discuss in Column 7, which we have here,

17  sodium caprylate is one example of a lubricant that can be used

18  in the tablets.  And that is, in the Table 1, one of the

19  inactive ingredients was NaCaprylate, and that is the excipient

20  being referred to there.

21          The patents also talk about binders.  And binders are

22  the glue that holds the different tablet components together.

23  The asserted patents explain that the binder could be

24  Polyethylene Glycol 8000 or PEG 8000, and that is the other

25  excipient that was referred to in Table 1 of the patent that we

1  looked at.

2         In this context, PEG is being used differently than it

3  was being used in some of the other colon cleansing

4  preparations that Mr. Noyes talked about.  In those it was used

5  in large amounts to induce purgation; here it's being used in a

6  small amount as an excipient and not as an active ingredient.

7         So another aspect of excipients that was important to

8  the invention was that the properties of these excipients

9  matter when you're putting together an effective colon

10  cleansing prep.

11         Mr. Noyes talked about the importance of being able to

12  visualize the colon during the colonoscopy procedure.  Because

13  the colon contains a lot of water, it's important for

14  visualization, for these tablets to dissolve effectively in the

15  colon.  So you don't want the tablets to leave -- to have

16  particles or leave an oily residue in the colon because that

17  could impede the efficacy of the colonoscopy.

18         So the inventors explained in the specification that

19  the claimed formulations use a minimal amount of water-soluble

20  excipients and that's so that they'll dissolve clearly and not

21  leave an insoluble residue in the colon when you take the

22  preparation.

23         So just a little more on dissolution.  The patents

24  discuss the quick dissolution of the tablets, including the

25  excipients in the water of the colon in order to facilitate the

1    visualization.  And the dissolution characteristics can be

2    evaluated using an apparatus where you put a tablet in a given

3    amount of solution and you have a paddle, swirl it around.  And

4    this can then be measured and it's called dissolution testing.

5    And the patent describes that at Column 9.

6         The patents also talk about the concept of turbidity

7    in Column 9, in the same portion where dissolution is discussed

8    that I just referred to.

9         THE COURT:  Can you say that again?  I am sorry.  Also

10   refers to what?

11        MS. PIROZZOLO:  Turbidity.

12        So turbidity refers to the cloudiness or haziness of a

13   fluid.  And turbidity can occur for several reasons, including

14   the compound leaving an oily residue.  So turbidity can also be

15   measured in a formulation using a device that measures how much

16   light is scattered as the solution -- as it passes through the

17   solution.  And this is described in the patent at Column 9.

18        And the units used are Nephelometric Turbidity Units

19   or NTUs.  The higher the NTU value, the more light scattering

20   has occurred and the more turbid or cloudy the solution is.

21        So another key aspect of the invention is the ability

22   to use large amounts of active ingredient as compared to these

23   inactive excipients we're talking about.  So on the screen are

24   these tablets and the actives are in green and the excipients

25   are in blue.

1         And the goal of the patent -- the patents discuss

2    reducing the excipients to as little as 10 percent or even as

3    little as 5 percent of the total weight of the tablet, and

4    having the active ingredients be in the neighborhood of at

5    least 60 to as high as 80 -- I am sorry, the sodium sulfate

6    active ingredients to be as high as 80 percent of the tablet.

7         And the significance of this ratio of excipients to

8    active ingredients is important because it allows the tablets

9    themselves to be smaller and the number of tablets the patients

10   take to be smaller.  And the idea is you're coming up with a

11   way to maximize the amount of active ingredient going into the

12   patient and minimize the amount of inactive ingredient to try

13   to make the tablets more compact and fewer and reduce the

14   burden on patients.

15        So the claimed tablet formulations are in order to be

16   more convenient for the patients and the patent talks about

17   this.  In addition to having these tablets that are manageable

18   size and quantity, you can drink water with the tablets so you

19   don't have to drink the salty tasting, kind of bad smelling

20   preparations that people really dislike.

21        The claimed -- this fact describes how you can take a

22   total of 24 tablets in a split dose of 12 so that it's making

23   it manageable with these two administrations for patients to

24   get the entire dose taken with water.  And by reducing the

25   barriers to compliance, the goal is to get more effective

1   colonoscopy prep for patients.

2           So those are some of the highlights of the spec, and I

3   was going to briefly just go through the claims of the patents

4   that are being asserted here.

5           The '656 Patent is one of the formulation patents I

6   mentioned.  The asserted claims are 1, 3, 8, 9, 11, 17, 18, and

7   20.  And the claims are directed to these formulations with the

8   three salts I mentioned.  So the claims have sodium sulfate in

9   blue, magnesium sulfate in purple, and potassium chloride in

10  green.

11          And they have ranges for the amounts of those

12  ingredients in the claims.  The claims also, if you look at

13  Claim 3, recite that that formulation of those salts is

14  compressed into tablet form.  Claim 8 -- in a tablet of 24

15  tablets, that's Claim 3.  And then Claim 8 specifies that those

16  tablets can be divided into two doses with each dose being 12

17  tablets, that's in Claim 9.

18          And Claim 17 and 18 talk about the dissolution

19  characteristics of the formulation, and Claim 20 talks about

20  the turbidity of the formulation as measured in the NTUs.  So

21  that's the claims that are being asserted in that '656 Patent.

22          The '697 Patent is the other composition patent, and

23  the main difference between the claims that are being asserted

24  there and the claims of the '656 Patent are that if you look at

25  Claim 1, there are more specific amounts of the three active

1    ingredients.  So 35.5 grams of sodium sulfate, 5.4 grams of

2    magnesium sulfate, and about 4.5 grams of potassium

3    chloride.

4           And this patent also recites the sodium caprylate

5    excipient, this patent in Claim 4.  And in Claim 5 it specifies

6    the PEG excipient is PEG 8000, which is a specific type of

7    PEG.

8           The '498 Patent is one of the method of administration

9    patents.  This patent basically claims administration of the

10   formulation and specifies administering the active ingredients

11   with water.  And claim -- the '864 Patent further describes the

12   dosing regimen and specifically mentions the PEG excipient

13   component.

14          So those -- that's a high-level review of the

15   specification and the claims.

16          And just to wrap up, these four patents are listed in

17   the FDA's Orange Book for SUTAB, so they cover the SUTAB

18   product that Mr. Noyes mentioned, and SUTAB was approved on

19   November 10th, 2020.

20          So if Your Honor doesn't have any questions -- or do

21   you have questions?

22          THE COURT:  Not yet.  I am a lawyer, right?  I am not

23   a scientist.  I say I went to law school because I can't do

24   science or math.  But when we have these days, I learn more

25   than I think I ever learned or thought I would learn as a

 1   lawyer.

 2          But no, very helpful.  Thank you very much.

 3          How long do you think -- is that the total of your

 4   presentation, I'm assuming, because you're at the end of your

 5   slides?

 6          MS. PIROZZOLO:  Yes.

 7          THE COURT:  How long do you think you'll be?  An hour?

 8          MR. ZIMMERMAN:  I believe I'm 45 minutes, Your Honor.

 9          THE COURT:  So what I'm going to do -- because I was

10   supposed to do the criminal matter at 1:30.  And if that's the

11   case, I will just make them wait 15 to 20 minutes rather than

12   breaking and make you wait.

13          MR. ZIMMERMAN:  I'm happy to begin.

14          THE COURT:  So if that's the case, then I think that

15   makes the most sense.

16          MR. ZIMMERMAN:  Your Honor, we also have some slides.

17          May I approach?

18          THE COURT:  Yes.

19          MR. ZIMMERMAN:  May I proceed, Your Honor?

20          THE COURT:  Yes.

21          MR. ZIMMERMAN:  Bill Zimmerman of Knobbe Martens on

22   behalf of the Lupin Defendants.

23          I think the good news is that the parties seem to

24   agree on a lot of the relevant background and the key issues

25   for today.

1          If we could go to the next slide.

2          This case relates to Lupin's filing of an Abbreviated

3    New Drug Application which seeks to market a generic version of

4    plaintiffs' SUTAB product.  SUTAB is an osmotic laxative for

5    cleansing the colon before a colonoscopy.  And as you heard, it

6    has three key active ingredients that we'll be discussing, all

7    of which are salts:  Sodium sulfate, magnesium sulfate, and

8    potassium chloride.

9          There are four asserted patents.  They're all from the

10   same family, they all have the same specification.  The only

11   difference is in the claims.

12         If we could go to the next slide.

13         As you heard from Mr. Noyes, the colonoscopy is a very

14   common procedure that's used to screen for GI diseases and

15   colon polyps, which can lead to cancer.  The procedure involves

16   imaging the colon with a small camera.  And because of the

17   nature of the procedure, it's important that the colon be

18   cleansed of fecal matter prior to the colonoscopy and you need

19   to be able to clearly visualize the lining of the colon.

20   That's the key part to be able to detect the disease and the

21   polyps.

22         And the figure on the slide is illustrative of what

23   the difference is between kind of pre-cleansing and

24   post-cleansing.  And you can see from the picture on the right,

25   you have far more visualization after you have a properly

1  cleansed colon.

2         If we could go to the next slide.

3         So osmotic laxatives are a very common type of

4  colonoscopy preparation, and SUTAB is an example of an osmotic

5  laxative.

6         And these osmotic laxatives work in one of two ways:

7  By either retaining water in the colon or drawing water into

8  the colon.  And they're typically comprised of poorly absorbed

9  salts or inert compounds, and this leads to a high

10  concentration of salt or compounds in the colon and then draws

11  the water in.

12         The high concentration creates an osmotic pressure

13  within the colon, and the body tries to balance that out by

14  bringing more water into the colon, as shown in the figure.

15  The increased water content then softens the stool and causes

16  peristalsis, which is the contraction of the intestinal muscles

17  which leads to purgation or emptying of the colon.

18         I'd like to talk a little bit about what the

19  colonoscopy prep landscape looks like prior to the introduction

20  of SUTAB.

21         If we could go to Slide 5.

22         There were a number of commercially-available options

23  for colonoscopy preps prior to the introduction of SUTAB.  As

24  reflected in the table, each of these preps had some benefits

25  as well as some significant drawbacks.  The polyethylene glycol

1  preps or the PEG preps were and still are very commonly used.

2  They're very effective and don't pose any major safety issue,

3  however, they have two drawbacks.  They require patients to

4  ingest a large volume of liquid, and that liquid generally had

5  a bad taste or a poor taste and that led to patient compliance

6  issues.

7          The second type that was available are the phosphate

8  solutions, predominantly sodium phosphate, and those aren't

9  commonly used today because of serious safety concerns.

10          Now, these sodium phosphate products were available as

11  tablets instead of the dissolved powder so they were more

12  tolerated by patients; however, they could cause serious side

13  effects which led to the FDA requiring a black box warning

14  which we saw earlier and I'll discuss more a little later.

15          You then had the oral sulfate solutions, and this was

16  the newest category.  These were safe and effective, but they

17  still suffered from some of the taste and volume issues of the

18  PEG preps.  And the one that I think you'll hear most about

19  during this case is the SUPREP product, and we will talk about

20  that in a little more detail.

21          And then fourth, you had kind of over-the-counter

22  treatments.  These were like Miralax and Gatorade.  They

23  weren't FDA approved, but they were still commonly used.  They

24  had a better taste than the other liquids, so they were better

25  tolerated by patients, but they weren't as effective as the

1    FDA-approved preparations.

2            If we could go to the next slide.

3            As you saw in plaintiffs' presentation, there are four

4    patents at issue.  They're from the same family and have the

5    same specification and they generally break down into two

6    groups.  You have the '656 and the '697 Patents, which are the

7    composition patents; and the '864 and the '498 Patents, which

8    are methods of treatment, method of administering the

9    composition to cleanse the colon.  And the priority date for

10   all of the relevant patents is August of 2017.

11           If we could go to the next slide.

12           Just to give you a general overview of the asserted

13   claims you're going to see.  Composition claims, similar to

14   Claim 1 of the '697 Patent; and then you'll see method of

15   administration claims, method of cleansing the colon claims,

16   similar to Claim 1 of the '498 Patent.

17           The commonality for all of the asserted claims is the

18   recitation of three salts:  Sodium sulfate, magnesium sulfate,

19   and potassium chloride.

20           Now, the specific amounts or ranges of those

21   ingredients will change, but those three salts are common

22   across all of the asserted claims.

23           If we could go to the next slide.

24           So here we see those three components:  The sodium

25   sulfate, magnesium sulfate, and potassium chloride.  When these

1  salts are dissolved in a liquid such as water, they break down

2  into their positively and negative charged components, which

3  are referred to as ions, and the positive and negative ions of

4  each salt are illustrated in the structure column.

5        You'll see that the sodium sulfate and magnesium

6  sulfate share the same negatively charged sulfate ion but they

7  have different salt counter ions, the sodium and the magnesium.

8        THE COURT:  Can you explain that because I don't

9  understand what you're saying.

10        MR. ZIMMERMAN:  Yes.

11        THE COURT:  You should know -- if I don't understand,

12  I'm just going to stop you and say I don't understand because

13  it doesn't make sense to wait until you're done.

14        So can you just explain that to me again?

15        MR. ZIMMERMAN:  Yes.  So what you see is all of these

16  salts have a positively charged piece and a negatively charged

17  piece, and when you put this together as a solid, the charge

18  cancels out and is zero.  When you put them in water, they

19  disassociate into pieces with a positive charge and pieces with

20  a negative charge.

21        And so in the chart you see the positively charged

22  piece for the first one is the sodium and it has a plus one;

23  and then the counter ion or the second piece, which has the

24  negative charges, the sulfate; and then for the magnesium

25  sulfate you see the positively charged magnesium and then the

1  negatively charged sulfate again.  So it's the same sulfate ion

2  in solution from the sodium sulfate or the magnesium sulfate.

3        So if you were to be given the solution, you couldn't

4  tell where the sulfates came from when they disassociated in

5  the water.

6        Does that make sense?

7        THE COURT:  A little bit.

8        MR. ZIMMERMAN:  And then for the third component it's

9  potassium chloride.  And when it's dissolved in water, it

10  breaks down into a positively charged potassium, which is

11  indicated with the K, and the negatively charged chlorine atom.

12  So when you put all of these components into solution and you

13  mix them with water, what you see, it's no longer sodium

14  sulfate, magnesium sulfate, and potassium chloride; it's ions

15  of sodium, ions of magnesium, ions of sulfate, ions of

16  potassium, and ions of chloride all floating around in the

17  solution.

18        If we could go to the next slide.

19        What we're going to see on the next two slides is a

20  table from an article from 2014 that summarized the available

21  colonoscopy preparations that were available at that time.  And

22  as shown in the table, there are many repeat ingredients that

23  show up in several of the preparations.  It's a more

24  comprehensive view of the landscape than the selected few we've

25  seen earlier.

1          And so you'll see that there is potassium chloride

2    widely used, sodium sulfate was widely used.  And if we turn to

3    the next slide, you'll see that the SUPREP kit introduced

4    magnesium sulfate to the mix.

5          If we could go to Slide 11.

6          So as discussed on the previous slide, one type of

7    commercially-available colonoscopy preparation which was

8    introduced in 2010 was the SUPREP bowel kit.  And this

9    contained sodium sulfate, potassium sulfate, and magnesium

10   sulfate.  This regimen was a split-dose formulation where the

11   patient would take half of the solution the night before the

12   colonoscopy and the second half of the solution the morning of.

13   And because of the way the claims are structured in the method

14   claims, the split-dosing is going to become an issue in the

15   case.

16         If we could proceed to Slide 12.

17         As discussed earlier, there were some tablet-based

18   colonoscopy preparations on the market in 2017, specifically

19   OsmoPrep and VISICOL.  Both of these medications included

20   sodium phosphate as their primary active ingredient and the

21   tablets were better tolerated by patients who preferred tablets

22   over ingesting large volumes of liquid that can be distasteful

23   as well.

24         However, OsmoPrep and VISICOL had two major drawbacks

25   that were suffered by both products.  First, they included an

1    ingredient called microcrystalline cellulose, and that's an

2    inactive ingredient or an excipient.  And this ingredient

3    doesn't dissolve in water and it would leave behind a residue

4    in the colon which made it more difficult to visualize the

5    colon during the colonoscopy process.

6          The second drawback was that sodium phosphate in these

7    products could cause acute phosphate nephropathy, and this was

8    a serious medical condition you heard about earlier that led to

9    serious kidney disease.

10          So if we turn to the next slide, the FDA then put a

11   black box warning on both of these products due to the safety

12   concerns from sodium phosphate.  And because of the safety

13   concerns, the sodium phosphate tablets were not as widely used

14   in 2017 despite their tolerability advantages compared to the

15   liquid-based preps.

16          If we could turn to Slide 14.

17          One issue that you heard briefly from with the

18   plaintiffs that will likely come up in the case relates to what

19   are called electrolyte shifts, and these can occur from the

20   preps from the colonoscopy.

21          Now, the electrolytes are salts or minerals in the

22   blood or bodily fluid that carry an electrical charge, and

23   these are often ions like the ions we discussed previously for

24   the salts that are claimed in the asserted patents.

25          And one potential concern with these types of osmotic

1   laxatives was their propensity to cause patients to experience

2   gains or losses in the electrolytes.  And this is illustrated

3   in the figure here which shows how osmotic laxatives can cause

4   an influx of electrolytes from the body into the colon, leaving

5   the body electrolyte depleted.

6        And these electrolyte shifts can cause health

7   problems, particularly if they're at the large enough

8   magnitude.  And one key example of this is the sodium phosphate

9   preps that we previously discussed.  What they were causing was

10  too much phosphate in the blood which was leading to the kidney

11  issue.

12       And these electrolyte shifts were often addressed by

13  adding salts to the colonoscopy prep in order to balance

14  electrolytes.  And you saw that most predominantly with the

15  polyethylene glycol or PEG-based solutions.

16       If we could go to the next slide.

17       So the table that we see on Slide 15 shows an overview

18  of the state of the electrolyte shifts with the various

19  products that were available in 2017.  And what we see is that

20  the PEG and sulfate-based preps were not associated with any

21  kind of measurable or effect-causing electrolyte shifts.  And

22  we did see those type of shifts in the sodium phosphate

23  products.

24       If we could go to the next slide.

25       Another issue that will likely arise in the case

1  relates to the dosing or administration of the colonoscopy

2  products and specifically what's often referred to as

3  split-dosing.  And split-dosing involves administering the

4  colonoscopy prep in at least two separate doses separated by

5  some amount of time.  And you saw this in the claims of the

6  method patents earlier.

7        Most commonly with these types of bowel preps what you

8  saw was a first dose administered the night before the

9  procedure and then a second dose the morning of, so the

10  split-dosing was fairly common for these products.  And what

11  we've shown on the screen is the split-dosing regimen for both

12  SUPREP and MOVIPREP.

13        Now, the split-dosing has been found to lead to two

14  things:  More effective colon cleansing because of the split

15  administration, you get two doses of the medicine which makes

16  it more effective by dividing them; and the second one was that

17  this was the predominant approach for colonoscopy cleansing by

18  2017.

19        And why is this going to be important?  If we go to

20  the next slide, both of the method claims, the method patents,

21  the '489 and the '864, require this type of split-dosing.  As

22  we've highlighted here, both of the methods of the claims

23  require that the compositions are administered as a first dose

24  and then a second dose that's administered later, both with

25  multiple volumes of liquid.

1          If we go to the next slide.

2          Another issue that was discussed previously and will

3    likely come up in the case is dissolution.  And this relates to

4    the process in which a substance is dissolved in a liquid and

5    forms a solution.  A very common example of this is dissolving

6    table salt in water.

7          And dissolution testing measures the extent and the

8    rate that a substance forms a solution.  So essentially, how

9    fast does it dissolve?  And the figure on the slide here, which

10   is similar to plaintiffs' figure, illustrates a common

11   apparatus that's used for dissolution testing.  It's the paddle

12   apparatus.  And as illustrated, the drug is placed within a

13   volume of a liquid medium as the paddle blade rotates; and then

14   the tense measures the amount of time it takes for the tablet

15   to dissolve in the liquid.  And the dissolution rate can be

16   important because it can impact the bioavailability of the drug

17   and the effectiveness of the drug.

18         If we go to the next slide.

19         This highlights why dissolution will likely be an

20   issue in this case.  Claims 17 and 18 of the '656 Patent

21   contain specific dissolution requirements.  Now, if we look at

22   what the specifications say about dissolution, it says you can

23   use the test methods provided in the United States

24   Pharmacopoeia Volume 36, Section 711.

25         If we turn to that section, the Pharmacopoeia provides

1    general guidance on performing dissolution methods.  For

2    example, it explains how to set up the apparatus that can be

3    used for the testing, such as the paddle.

4            Importantly, there are things that it doesn't tell

5    you.  The Pharmacopoeia doesn't tell you the paddle rotation

6    speed, it doesn't tell you the dissolution media that's used,

7    it doesn't place any specifics on the dissolution

8    characteristics that a drug has to meet, and those aren't in

9    the specification either.

10           And so the dispute between the parties there is going

11   to be whether the disclosure in the patents is sufficient for

12   the dissolution testing required.

13           If we go to the next slide.

14           Another topic that will come up in the case is the

15   role of excipients, and we heard some about this earlier.  In

16   pharmaceutical products, an excipient is an inactive substance

17   that provides the medium for delivering the drug.  And the

18   excipients are commonly referred to based on their function,

19   that's how they're characterized, and the role they play in the

20   tableting process.

21           For example, on the right side of the slide we have an

22   excerpt from the patent specification which state that the

23   disclosed compositions can include one or more excipients, and

24   here they're characterized by function, binders, lubricants,

25   grinders, et cetera.

1          In this case we'll be focusing on two particular

2    functions of the excipient:  One as a binder and one as a

3    lubricant.  As the name suggests, binders are the substances

4    that help bind the powder mixture together to form the tablets.

5    Lubricants are substances that reduce friction and prevent

6    tablet material from sticking to the equipment as the tablets

7    are compressed together.  And this is important in getting

8    uniformity for the tablets with respect to size and

9    compression, which can impact how the tablets repeatedly

10   function.

11          If we could turn to the next slide.

12          In the context of the tablets that were used for

13   colonoscopy preparations, one of the important factors that was

14   recognized in 2017 was to avoid insoluble excipients in the

15   tablets.  And we saw this earlier with respect to the

16   microcrystalline cellulose in the sodium phosphate tablets.  It

17   wouldn't dissolve and would leave a residue that could obscure

18   visualization of the colon.  So one of the key factors at this

19   time was to use excipients that were fully soluble or mostly

20   soluble in water.

21          If we could turn to the next slide.

22          The two key excipients that will become at issue

23   during the case are the binders and lubricants, and

24   specifically the binder polyethylene glycol and the lubricant

25   sodium caprylate.  And as you'll see, both of these are claimed

1   in various claims of the asserted patents and the patents

2   generally discuss them in the specification.  But the

3   discussion of them is limited to their function in terms of

4   binder and lubricant.

5           If we could turn to the next slide.

6           Here we have an excerpt from the Handbook of

7   Pharmaceutical Excipients that describes polyethylene glycol.

8   As highlighted in the handbook, polyethylene glycol or PEG is a

9   water-soluble excipient which is important for avoiding those

10  residues that can obscure visualization during the colonoscopy.

11          And the handbook recognizes that high-molecular-weight

12  PEGs or polyethylene glycols were known to enhance the

13  effectiveness of tablet binders.

14          If we turn to the next slide, we address the second

15  excipient.  And here we have an excerpt from the Handbook of

16  Pharmaceutical Excipients and one from the US Pharmacopeia

17  National Formulary that provide information on the second

18  excipient lubricant, sodium caprylate and sodium.

19          And sodium caprylate was discussed in the handbook as

20  being used as a stabilizer during the production of albumin

21  solutions, and it was also known that sodium caprylate could be

22  dissolved in water, again, so it wouldn't leave the residue

23  that impeded visualization during the colonoscopy.

24          And finally, Your Honor, I'd like to turn to the issue

25  of turbidity.  There was some discussion of it earlier.  And

1    this is how cloudy a solution is.  And turbidity is measured in

2    Nephelometric Turbidity Units or NTU, as referred to in the

3    specification.  And that's a measure of how hazy the solution

4    is.  And as we can see on the top left side of the screen, you

5    can see different kind of grades of visualization based on the

6    NTU units.

7         And this testing is done by passing laser light

8    through the solution, as shown in the bottom left corner.

9         If we turn to the next slide, the reason turbidity

10   becomes important is because it is recited in Claim 20 of the

11   '656 Patent.  There is a brief discussion of turbidity in the

12   patent, but no discussion of the parameters used of the

13   turbidity testing, no disclosures of results of turbidity

14   testing, no discussion of how to conduct the testing.  And

15   again, there will be a dispute between the parties as to

16   definiteness and the amount of disclosure and was that

17   sufficient.

18        Does Your Honor have any questions?

19        THE COURT:  Not right now.

20        MR. ZIMMERMAN:  Thank you very much.

21        THE COURT:  Okay.  So counsel, we're scheduled to do a

22   hearing on October 29th.  You'll have to remind me, because I'm

23   in the midst -- I think in the next month or so I have three

24   *Markman* hearings.

25        Are you just arguing or are you presenting testimony?

 1  How many witnesses do you think you'll have?

 2          MR. NOYES:  Your Honor, we don't have any witnesses.

 3  It's just argument.

 4          THE COURT:  So you're both just going to argue.  Okay.

 5  That's this case.  All right.

 6          MR. ZIMMERMAN:  Yes, Your Honor.

 7          THE COURT:  So I will just tell you this -- you can

 8  both be seated.  You should not presume that I know or

 9  understand anything.  I have not had an ANDA case before.  I've

10  done patent cases before, I've done patent preliminary

11  injunction cases before, but I have not done an ANDA case.  So

12  to the extent you think you don't want to insult me, I'd rather

13  you insult me and start at a kindergarten level.  Because as I

14  said before, if I can't understand it, I can't decide it and

15  it's not fair to either of you.  And if I can't understand it,

16  I will stop you and say please go back.

17          So the simpler you start, quite frankly, the better

18  for me.  This is extraordinarily helpful.  One of the reasons I

19  like to do this not on the same day, particularly when there

20  are multiple patents, is because I read the briefs, then I --

21  which I usually can't make too much sense of.  Then I listen to

22  this, and this is extremely helpful, it starts to kind of make

23  sense, and I'll go back and read the briefs again before you

24  come in.

25          And not always, but my intent would probably be to,

```
 1   depending on how I feel coming out, I may just rule from the
 2   bench or I may need more time to sort of think about it.  Okay?
 3   So that's how I intend to proceed.
 4           Anything else today from plaintiff?
 5           MR. NOYES:  Not from us, Your Honor.  Thank you very
 6   much.
 7           THE COURT:  Anything else from the defendant today?
 8           MR. ZIMMERMAN:  Not from defendants, Your Honor, but I
 9   do have one question for the Markman hearing.
10           Do you want us to go plaintiff first and then
11   defendant on all terms, or would you prefer term by term,
12   plaintiff, defendant?
13           THE COURT:  It is much easier for me -- so hopefully
14   you'll agree -- to go term by term.  Because I can listen to
15   what you have to say, listen to what you have to say, ask
16   whatever questions I have right then and there, then move on to
17   the next one.
18           So I would prefer that when we have multiple issues
19   like now.  Is that agreeable to you both?
20           MR. NOYES:  That's fine with us, Your Honor.
21           MR. ZIMMERMAN:  Yes, Your Honor.
22           THE COURT:  Thank you very much for asking.  I do much
23   prefer that.
24           Anything else?  Do we still think -- I have from 10:00
25   to 1:00 blocked off for this.  Do you think that's sufficient?
```

1          MR. NOYES:  I think that's more than sufficient.

2          MR. ZIMMERMAN:  I'm hopeful we can give the Court back

3    time on that day.

4          THE COURT:  I always like to have a little extra

5    because I don't want to be rushed and if I or my clerks have

6    questions.

7          So thank you for coming in early so you can

8    accommodate the criminal matter.  This has been extraordinarily

9    helpful.  I'll see you all in two weeks.  We're adjourned.

10          THE COURTROOM DEPUTY:  All rise.

11          (Matter adjourned at 1:24 p.m.)

12

13          - - - - - - - - - - - - - - - - -

14

15          I certify that the foregoing is a correct transcript

16    from the record of proceedings in the above-entitled matter.

17

18    _/S/ Sharon Ricci, RMR, CRR_
      *Official Court Reporter*

19

20    _October 15, 2024_
           *Date*

21

22

23

24

25

*United States District Court*
*District of New Jersey*